# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KINGMAN PARK CIVIC ASSOCIATION, | |
| Plaintiff, | |
| v. | **Civil Action No. 13-990 (CKK)** |
| VINCENT C. GRAY, | |
| Defendant. | |

## MEMORANDUM OPINION
(July 29, 2013)

Plaintiff Kingman Park Civic Association ("Kingman Park") filed suit against Vincent C. Gray in his official capacity as the Mayor of the District of Columbia, challenging aspects of the District's plan to construct a streetcar line in the Northeast quadrant of the District.  Presently before the Court is the Plaintiff's [5] Amended Motion for Temporary Restraining Order, for Preliminary Injunction and for Waiver of Bond.  Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court finds that the Plaintiff is not likely to succeed on the merits of its claims, the Plaintiff is not likely to suffer irreparable injury absent emergency relief, and the balance of the equities do not favor injunctive relief.  With the public interest weighing against an injunction, on balance the Court finds emergency injunctive relief is not warranted in this case.  Accordingly, the Plaintiff's motion is DENIED.

## I. BACKGROUND

### A.    Factual Background

The District of Columbia intends to construct a "a surface fixed rail and streetcar public

---

[1] Pl.'s Am. Mot., ECF No. [5]; Def.'s Opp'n, ECF No. [8]; Pl.'s Reply, ECF No. [9]; Def.'s Sur-Reply, ECF No. [13]; Def.'s Suppl. Sur-reply, ECF No. [15].

transportation network," comprised of eight lines extending across 37 miles.  Def.'s Ex. A (Nicholson Decl.) ¶ 4; *see also* DC's Transit Future Sys. Plan Final Report, April 2010.[2]  The first leg of the system consists of 2.2 miles of track along H Street and Benning Road in the Northeast quadrant of the District, connecting Benning Road to Union Station (hereinafter the "H Street line").  Nicholson Decl. ¶ 7.  Construction on the H Street line began in 2008 with new parking lanes, sidewalks, street lights, reconstructed roadways, streetcar tracks, and pole foundations.  Nicholson Decl. ¶ 10.  The streetcars "will be powered by quiet electric motors, and use a pole and pantograph to collect power from an electrified wire that is suspended approximately twenty feet over the lane on which it runs."  Def.'s Opp'n at 4.  At some point this month, the District will begin installing poles and overhead contact wires for the overhead cantilever system that will power the streetcars.  Nicholson Decl. ¶ 12.  Installation of the overhead cantilever system is expected to be completed in late September or early October of this year. *Id.*

The District of Columbia Department of Transportation ("DDOT") intends to build a "car barn" training center on the grounds of the Joel Elias Spingarn Senior High School (the "Spingarn campus"), located on the 2500 block of Benning Road, Northeast.  Nicholson Decl. ¶ 14.  Spingarn Senior High School was a public school prior to its closure in July 2013. *Id.* at ¶ 15.  In November 2012, the District of Columbia Historic Preservation Review Board designated Spingarn High School as an historic landmark in the District of Columbia Inventory of Historic Sites.  Am. Compl. ¶ 31.  The car barn will be used to house streetcars while not in operation, and will also serve as "an operations base and maintenance facility" where workers

---

[2]  The Final Report is available at
http://ddot.dc.gov/DC/DDOT/About+DDOT/Publications/DC+Transit+Future?f07590d02e4682
10VgnVCM2000007f6f0201RCRD_itemsPerView=10&renderPage=0&vgnextrefresh=1

will be trained to repair streetcars.  Nicholson Decl. ¶ 16.  In late June 2013, the District began

constructing tracks and temporary facilities to enable system testing and certification.  *Id.* at ¶ 20.

Excavation of the planned car barn site was set to begin the week of July 15, 2013.  *Id.* at ¶ 23.

Five streetcars are scheduled to be delivered to the Spingarn campus in October 2013.  *Id.* at

¶ 21.  Construction of the permanent car barn structure will begin "this Fall," and the District

expects the car barn to be completed in the summer of 2014.  *Id.* at ¶ 22.

    The District plans to install three "traction power substations" to provide power along the

H Street line.  Nicholson Decl. ¶ 13; Compl., Ex. 3 (DC Streetcar Sys. Plan: H St/Benning Rd &

Future Segments & Exts.) at 12; Pl.'s Reply, Ex. 3 (DDOT, Traction Power Supply Distribution).

One of the substations is expected to be installed on the Spingarn campus.  Nicholson Decl. ¶ 13;

*see also* Compl., Ex. 3 at 12 (noting the substation location for the eastern end of the H Street

line is near the intersection of Benning Road and 26th Street, Northeast).[3]  The substation will

only operate while the streetcars are in service.  Def.'s Opp'n at 5 (citing Car Barn Training Ctr.

Info. & FAQs, Spring 2013, at 3).   The "underground infrastructure" for each of three

substations is currently being installed.  Nicholson Decl. ¶ 13.  To date, none of the substations

have been installed, but all three substations have been purchased and are being manufactured.

*Id*.  The substation to be installed on the Spingarn campus is scheduled to be delivered on

October 22, 2013.  *Id*.

    B.    *Procedural History*

    The Plaintiff filed suit on June 28, 2013, and simultaneously filed a motion for a

---

    [3]  The other substations for the H Street line will be installed on 2nd Street, NE "[u]nder
the East Abutment of the H Street Bridge (Hopscotch Bridge) behind the existing closure wall,"
and on the Southwest corner of H and 12th Streets "in the Public Space directly adjacent to
Kahn's Barbeque Restaurant."  Nicholson Decl. ¶ 13.

temporary restraining order ("TRO") and preliminary injunction.  During a telephone conference call on the record with the parties on July 1, the parties agreed to a schedule for briefing the Plaintiff's requests for a TRO and preliminary injunction separately.  Shortly thereafter, the Defendant informed the Court that excavation for the electrical substation was expected to begin the week of July 1.  Def.'s Notice, ECF No. [4].  The Plaintiff subsequently withdrew its initial motion for emergency relief and filed the present Amended Motion.  The Defendant elected to file an omnibus opposition to the Plaintiff's motion rather than respond separately to the Plaintiff's request for a TRO and for a preliminary injunction, and the Plaintiff filed a reply.  In light of the new arguments raised in the Plaintiff's reply brief, the Defendant moved to strike portions of the reply, or in the alternative, for leave to file a sur-reply.  Def.'s Mot. to Strike, ECF No. [11].  In this case, the Court found the interests of justice would be best served by deciding the Plaintiff's motion based on full briefing of all of the issues raised by the parties, rather than excluding particular arguments on procedural grounds.  7/23/13 Order, ECF No. [12].  Accordingly, the Court denied the Defendant's motion to strike, but granted the Defendant leave to file a sur-reply.  *Id.*  The Court also instructed the Defendant to supplement his sur-reply to address the new arguments in the Plaintiff's reply concerning its equal protection claims.  *Id.*  Having received the Defendant's sur-reply and supplement thereto, the Plaintiff's motion is now ripe for consideration by the Court.

## II.  LEGAL STANDARD

A temporary restraining order or preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).  A plaintiff seeking a preliminary injunction or TRO must establish that (1) it is likely to succeed on the merits, (2) it is likely to

suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction would be in the public interest. *Id*. at 20. "The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 243 (D.D.C. 2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

Historically, these four factors have been evaluated on a "sliding scale" in this Circuit, such that a stronger showing on one factor could make up for a weaker showing on another. *See Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). Recently, the continued viability of that approach has been called into some doubt, as the United States Court of Appeals for the District of Columbia Circuit has suggested, without holding, that a likelihood of success on the merits is an independent, free-standing requirement for a preliminary injunction. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). However, absent binding authority or clear guidance from the Court of Appeals, the Court considers the most prudent course to bypass this unresolved issue and proceed to explain why a preliminary injunction is not appropriate under the "sliding scale" framework. If a plaintiff cannot meet the less demanding "sliding scale" standard, then it cannot satisfy the more stringent standard alluded to by the Court of Appeals.

### III. DISCUSSION

The Plaintiff seeks a temporary restraining order enjoining the installation of overhead wires for the overhead cantilever system and the excavation on the Spingarn campus. The Plaintiff also seeks a preliminary injunction enjoining those activities, as well as any construction for the car barn, substation, or other facilities on the Spingarn campus. The Defendant filed an

omnibus opposition to the Plaintiff's request for both a TRO and a preliminary injunction, therefore the Court addresses the Plaintiff's requests together.  The Court begins with the Defendant's contention that the Plaintiff lacks standing to bring this action, before turning to the four factor test for preliminary injunctive relief.  Because preliminary injunctive relief is not warranted in this case, the Court does not reach the issue of whether Kingman Park should be required to post a bond.

A.      Standing

As a threshold issue, the Defendant argues Kingman Park lacks standing to challenge the installation of the overhead wires or construction at Spingarn.  The "irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  First, the plaintiff must have suffered an "injury-in-fact," that is, "'an invasion of a legally protected interest' that is (i) 'concrete and particularized' rather than abstract or generalized, and (ii) 'actual or imminent' rather than remote, speculative, conjectural or hypothetical."  *In re Navy Chaplaincy*, 534 F.3d 756, 759-60 (D.C. Cir. 2008) (quoting *Lujan*, 504 U.S. at 560).  Second, the asserted injury must be "fairly traceable to the challenged action of the defendant."  *Lujan*, 504 U.S. at 560 (citation omitted).  Third, the plaintiff must demonstrate redressability: "[i]t must be likely that a favorable decision by the court would redress the plaintiff's injury."  *Id*. at 561.  It is axiomatic that the "party invoking federal jurisdiction bears the burden of establishing the[ ] elements" of constitutional standing.  *Id.*

An association like Kingman Park may establish standing to sue in two ways.  First, Kingman Park may sue on its own behalf if it "meet[s] the general standing requirements applied to individuals."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).   Second, Kingman Park may sue on behalf of its members if it demonstrates

"associational standing." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). Associational

standing requires the organization to show that

> (1) at least one of its members would have standing to sue in his own right, (2) the
> interests the association seeks to protect are germane to its purpose, and (3)
> neither the claim asserted nor the relief requested requires that an individual
> member of the association participate in the lawsuit.

*Id.* Kingman Park argues that it has standing to sue the Defendant both on its own behalf and on

behalf of its members.

       1.   <u>Organizational Standing</u>

To establish organizational standing, Kingman Park "must allege that discrete

programmatic concerns are being directly and adversely affected by the challenged action."

*Nat'l Taxpayers Union*, 68 F.3d at 1433. The Amended Complaint describes Kingman Park as

"an unincorporated neighborhood civic association" which "seeks to preserve and protect the

historic buildings, scenic views, integrity and environment within the District of Columbia, and

specifically, the Kingman Park neighborhood." Am. Compl. ¶ 6. In September 2012, Kingman

Park filed an application seeking to designate Spingarn as an historic landmark, and the District

of Columbia Historic Preservation Review Board unanimously designated the property as an

historic landmark in November 2012. *Id.* at ¶¶ 29, 32. The Defendant is now in the process of

building a car barn, maintenance facility, and electrical substation on the grounds of an historic

landmark Kingman Park specifically sought to protect, an injury that is directly traceable to the

conduct of the Defendant, and would be redressable by an order from this Court barring

construction on the site of Spingarn Senior High School. "Such concrete and demonstrable

injury to the organization's activities—with the consequent drain on the organization's

resources—constitutes far more than simply a setback to the organization's abstract social

interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). On this record,

Kingman Park is likely to succeed in showing it has organizational standing to challenge construction at Spingarn Senior High School.

However, the Court agrees with the Defendant that Kingman Park's allegations with respect to the overhead wires are likely insufficient to establish organizational standing. The allegations in the Amended Complaint relate only to Kingman Park's opposition to the construction at Spingarn. Moreover, the Plaintiff's briefs fail to offer any explanation as to how the overhead wires would concretely affect any of the organization's programmatic concerns. Thus, Kingman Park is not likely to succeed in demonstrating it has organizational standing to challenge the installation of overhead wires on H Street and Benning Road.

2.     Associational Standing

In support of its reply brief, Kingman Park submitted declarations from James R. Wiggins, Charlie L. Murray, Jr., Joan Johnson, Allen Green, Dr. Jean Marie Miller, and Veronica E. Raglin. *See generally* Pl.'s Reply, Ex. 1. Curiously, only Joan Johnson, Allen Green, and Dr. Miller indicate that they are members of the Kingman Park Civic Association. Therefore, the Court looks only to Ms. Johnson's, Mr. Green's, and Dr. Miller's declarations to determine if Kingman Park is likely to succeed in demonstrating it has associational standing to challenge the Defendant's streetcar project.[4]

---

[4]  The Plaintiff would not be likely to succeed in demonstrating associational standing even if the Court considered the declarations of Mr. Wiggins, Mr. Murray, and Ms. Raglin because the relevant allegations in each declaration are substantively (if not textually) identical to the allegations discussed *infra*. The Court further notes that the Plaintiff attached a declaration from Ms. Raglin to its original motion for temporary restraining order, but did not submit the declaration in support of its amended motion for emergency relief. Pl.'s Mot. for TRO, ECF No. [2], Ex. 4. Ms. Raglin's original declaration does not contain any allegations regarding injuries she personally may suffer as a result of the streetcar project, and thus would not compel a different result. *See id.* at ¶ 7 (explaining "[m]embers of the association oppose the construction for several reasons . . .") (emphasis added).

With respect to the overhead wires, the declarations submitted by Ms. Johnson, Mr. Green, and Dr. Miller each contain a single, identical paragraph, alleging that the wires "will adversely affect the clear and unobstructed views of (1) the nationally historic Langston Dwellings; (2) the historic Spingarn High School and its grounds; (3) the nationally historic Langston Golf Course; and (4) the Anacostia River."  Johnson Decl. ¶ 2; Green Decl. ¶ 2; Miller Decl. ¶ 2.  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).  Neither Ms. Johnson, Mr. Green, nor Dr. Miller alleges that he or she derives any aesthetic or recreational value from the four areas listed.  Nor do any of the declarants assert that any value he or she might derive would be adversely affected by the overhead wires.

The declarations further assert that "[t]he city admits that electromagnetic fields will be produced by the overhead wires," but none of the declarants claim they will be harmed by electromagnetic fields ("EMFs") emitted by the wires, or that the EMFs will otherwise affect their use of the land over which the wires will be installed.  *See* Johnson Decl. ¶ 7; Green Decl. ¶ 7; Miller Decl. ¶ 6; *see also* Second Raglin Decl. ¶ 7.  The allegation that *someone's* aesthetic or recreational enjoyment would be adversely affected by the overhead wires is insufficient to establish "impending dangers for any particular member of the [Plaintiff's] association."  *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 819 (D.C. Cir. 2006).  For the same reason the allegation in each declaration that construction of the car barn "w[ill] block the historic site[] and degrade the appearance of the historic structure," is insufficient to establish an injury-in-fact.

Johnson Decl. ¶ 4; Green Decl. ¶ 4; Miller Decl. ¶ 4(a).[5]

In terms of the construction on the site of Spingarn Senior High School, Ms. Johnson indicates that "[w]hen construction commenced on the streetcar tracks the vibration and noise caused cracks in the walls and foundation of [her] property." Johnson Decl. ¶ 3. Yet Ms. Johnson does not allege (much less explain how) construction at Spingarn Senior High School is likely to damage her property on 20th Street, Northeast—several blocks away. Mr. Green makes an identical allegation regarding the harm caused by his property as a result of the construction of the streetcar tracks, but likewise fails to allege that construction at Spingarn Senior High School is likely to damage his property on 23rd Place, Northeast. Green Decl. ¶ 3. These allegations are insufficient because they "relate[] to past injur[ies] rather than imminent future injur[ies] that are sought to be enjoined." *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009). Dr. Miller does not allege that her property was damaged by previous construction in connection with this project, nor does she allege any future damage is likely. The declarants' conclusory assertion that they are "certain that the construction and excavation will cause damage to the hundreds of homes and businesses," Johnson Decl. ¶ 5; Green Decl. ¶ 5; Miller Decl. ¶ 4(b), does not satisfy the requirement that Kingman Park show a substantial probability that at least one of its members will suffer an injury-in-fact as a result of the construction at Spingarn. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011).

Finally, the declarations submitted by Ms. Johnson, Mr. Green, and Dr. Miller assert that "the excavation work [will] adversely affect the air quality and [their] physical health" because "[t]here are many known hazardous substances . . . in the soil." Johnson Decl. ¶ 6; Green Decl.

---

[5] Dr. Miller's Declaration contains two paragraphs numbered "4," therefore the Court refers to the paragraphs as "4(a)" and "4(b)" respectively.

¶ 6; Miller Decl. ¶ 5.  However, none of these individuals allege that they live or work in close proximity to Spingarn Senior High School such that they might be exposed to any alleged hazardous materials released by the construction activity, or that they will be forced to change their behavior in any manner.[6]  *Cf. Ass'n of Battery Recyclers, Inc. v. E.P.A.*  716 F.3d 667, 672 (D.C. Cir. 2013) ("Several members aver that they live or work in close proximity to smelters and have reduced their time outdoors in response to concerns about pollution—precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact.").

In sum, Kingman Park is not likely to succeed in showing any of its members is substantially likely to suffer an injury-in-fact such that they would have standing to sue in their own right as to any of the aspects of the H Street line at issue in the Amended Complaint.[7] Therefore Kingman Park is not likely to show that it has associational standing to bring this case on behalf of its members.  Nevertheless, the Plaintiff is likely to succeed in demonstrating that the organization itself has suffered an injury-in-fact and otherwise satisfies the requirements for standing to challenge the excavation and construction on the site of Spingarn Senior High School.

---

[6]  The declarants lament that "the city failed to conduct an Environmental Impact Study [EIS] to address our complaints."  Johnson Decl. ¶ 6; Green Decl. ¶ 6; Miller Decl. ¶ 5.  The Plaintiff did not suggest in its reply brief that any of its members would have procedural standing to sue in their own right, therefore the Court does not address the issue.  In any event, a claim of procedural standing would fail for the same reason: the Plaintiff is not likely to succeed in demonstrating a substantial probability that any of its members face a concrete and imminent injury-in-fact.  *See Nat'l Ass'n of Home Builders*, 667 F.3d at 15

[7]  Because none of the members of the Kingman Park Civic Association sufficiently allege *they* are likely to suffer any injury-in-fact, the Court need not reach the Defendant's argument that the environmental harms identified by the association members are too speculative to constitute an injury-in-fact.  Def.'s Opp'n at 16-17.  However, the Court does consider the Defendant's arguments on this point in evaluating the Plaintiff's claim of irreparable injury.

B.      *Likelihood of Success on the Merits*

As set forth above, the Plaintiff is not likely to succeed with its challenge to the overhead wires because it is not likely to show it has standing to challenge the installation of the wires. Moreover, even if the Plaintiff has standing to challenge both the installation of the overhead wires and construction on the Spingarn campus, the Plaintiff is not likely to succeed on the merits of its substantive claims.

1.      Transportation Infrastructure Emergency Amendment Act of 2010

Initially, the Plaintiff argues that it is likely to succeed in showing that the Transportation Infrastructure Emergency Amendment Act of 2010 (the "2010 Act") violates federal law. Enacted by Congress in 1888, D.C. Code § 34-1901.01 prohibited the Mayor from authorizing "any additional telegraph, telephone, electric lighting or other wires to be erected or maintained on or over any of the streets or avenues of the City of Washington."  D.C. Code § 34-1901.01. The relevant portion of the 2010 Act, provides that "[n]otwithstanding any other law, the Mayor is authorized to install aerial wires . . . for the sole purpose of powering or supporting wires that power streetcar transit where aerial wire power is necessary or, . . . is more feasible than other currently available forms of propulsion."  D.C. Code § 9-1171(a).  "The installation of aerial wires authorized by this section is limited to the H Street/Benning Road streetcar transit line, between the intersection of North Capitol Street and H Street, N.E. on the west and the Anacostia River on the east until the requirements of § 9-1173 are met."  *Id.* § 9-1171(b).  The Defendant argues the Plaintiff is not likely to succeed on this claim because the Home Rule Act, enacted in 1973, which vested the District of Columbia with legislative authority in certain areas, permitted the District to repeal the 1888 statute.  The Court agrees.

Article I, section 8 of the United States Constitution vests Congress with exclusive

legislative authority over the District of Columbia.  U.S. Const. art. I, s. 8, cl. 17.  Congress passed the Self-Government Act to "relieve Congress of the burden of legislating upon essentially local District matters."  D.C. Code § 1-201(a).  Congress delegated certain specific legislative powers to the District of Columbia government.  *Id*.  These legislative powers "extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution."  *Id.* § 203.02.  This delegation was subject to Congress' retention of ultimate legislative authority over the District of Columbia:

> Notwithstanding any other provision of this chapter, the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this chapter, including legislation to amend or repeal any law in force in the District prior to or after enactment of this chapter and any act passed by the Council.

*Id.* § 206.01.  Section 206.02 outlines the general proposition that the Council lacks authority "to pass any act contrary to the provisions" of the Home Rule Act, as well as specific limitations on the Council's authority, including that the Council shall not "[e]nact any act, or enact any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District."  *Id.* § 206.02(a)(3).  Moreover, the Council must provide the Speaker of the House of Representatives and the President of the Senate with a copy of any act passed by the Council and signed by the Mayor.  The act becomes effective thirty days after it is transmitted to Congress "unless during such 30-day period, there has been enacted into law a joint resolution disapproving such act."  D.C. Code § 206.02(c)(1).

The Plaintiff does not suggest that the overhead wires for a streetcar service fall outside the Council's legislative authority.  Rather, the Plaintiff argues that the Council cannot repeal *any* law enacted by Congress under any circumstances.  Pl.'s Reply at 7.  The Home Rule Act---a statute duly enacted by Congress—in fact authorizes the Council to repeal statutes previously enacted by Congress restricted in their application exclusively to or in the District of Columbia. In other words, the Council "may repeal a congressionally-enacted statute limited in application to the District of Columbia, [but] the Council may not repeal a federal statute of broader application." *McConnell v. United States*, 537 A.2d 211, 215 (D.C. 1988).  The Transportation Infrastructure Emergency Amendment Act of 2010 implicitly repealed a statute applicable only to the District of Columbia.  The act was signed by the Defendant on January 12, 2011, and transmitted to both houses of Congress for review.  Congress did not object to the act, and it went into effect on March 31, 2011.  Congress retains the authority to repeal the 2010 Act in the future, but at this time the 2010 Act effectively repealed the 1888 prohibition on overhead wires. Therefore, the Plaintiff is not likely to succeed in showing the 2010 Act violated federal law.

2.   Equal Protection

Counts II and III of the Amended Complaint allege the District's decision to authorize installation of overhead wires on the H Street line and decision to construct the car barn on the campus of Spingarn High School violated the Plaintiff's right to equal protection as set forth in the Fifth and Fourteenth Amendments.  Am. Compl. ¶¶ 37-60.  The Fourteenth Amendment does not apply to the District of Columbia, but the Equal Protection Clause of the Fourteenth Amendment applies to the District of Columbia through the Due Process Clause of the Fifth Amendment.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Dixon v. District of Columbia*, 666 F.3d 1337, 1339 (D.C. Cir. 2011).

14

"The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way." *Jones v. Helms*, 452 U.S. 412, 423-424 (1981). In other words, plaintiffs may allege two types of equal protection violations: (1) that the plaintiff was subject to differential treatment *because of* membership in a protected class, such as one based on race; or (2) that the plaintiff was "arbitrarily and intentionally treated differently from others who are similarly situated—and the government has no rational basis for the disparity." *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012) (citing *Willowbrook v. Olech*, 528 U.S. 562, 564-565 (2000)).

The Plaintiff's Amended Complaint and motion for emergency relief frame the Plaintiff's equal protection claims as the second type of claim. *See, e.g.*, Am. Compl. ¶ 40 ("Defendant unconstitutionally enacted a streetcar overhead wires law, which limited the construction of overhead streetcar wires to northeast Washington, D.C., and no other area of the city."); *id.* at ¶ 52 ("Defendant violated the equal protection clause of the U.S. Constitution when the District limited the streetcar barn and maintenance industrial facility to the historic Spingarn High School site in northeast Washington, D.C., and to no other area of the city or historic site."). The Plaintiff alleges a disparate impact on African-American and low-income residents in Kingman Park, but "[i]n order to prove that a facially neutral statute, such as the one involved here, violates equal protection guarantees, a challenger must demonstrate a racially discriminatory purpose behind the statute. Disparate racial impact can be probative of such purpose, but it is not dispositive without more." *United States v. Holton*, 116 F.3d 1536, 1544 (D.C. Cir. 1997) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).

The Constitution "does not require things which are different in fact or opinion to be

treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted). "[T]he [d]issimilar treatment of dissimilarly situated persons does not violate equal protection. The threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *Women Prisoners of D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (citations omitted). The Plaintiff's equal protection claims will likely fail this initial inquiry.

The Plaintiff alleges that the Defendant denied it equal protection by "enact[ing] a streetcar overhead wires law, which limited the construction of overhead streetcar wires to northeast Washington, D.C., and no other area of the city." Pl.'s Am. Mot. at 8. As the Defendant notes, this argument rests on a faulty premise: the Transportation Infrastructure Emergency Amendment Act of 2010 authorized the installation of overhead wires to power streetcar transit *anywhere* in the District of Columbia, not just predominantly African-American communities. D.C. Code § 9-1171(b). The District ultimately plans to install streetcar lines in all eight wards of the District, including lines from Woodley Park to Congress Heights and from Georgetown to Anacostia, and which may require overhead wires. Nicholson Decl. ¶ 4; DC's Transit Future Sys. Plan Final Report at 4-1.

To be fair, the installation of overhead wires is specifically limited to the H Street line until the Mayor complies with the requirements of D.C. Code § 9-1173. Section 9-1173 requires the Mayor to "develop a plan for the use of aerial wires for each phase or extension of the streetcar transit system and submit the plan to the Council, along with a written report" addressing various issues. *Id.* § 9-1173(a). As the Defendant explained "th[e] authorization [for overhead wires] is initially limited to the H Street & Benning Road Line—i.e., the first approved

leg of the DC Streetcar System—until the Council has the opportunity to approve the specific plans for subsequent streetcar lines." Def.'s Suppl. Sur-reply at 4. The Council extensively reviewed and approved the plan for constructing a streetcar line along H Street and Benning Road before the 2010 Act was even passed, but had not done so for any other planned aspect of the streetcar project.[8] The Mayor will have to comply with the requirements of section 9-1173 before installing overhead wires along *any* additional streetcar lines, including those that will run through predominantly African-American communities. Thus, the Plaintiff cannot show that Kingman Park has been treated differently than any similarly situated community; the other communities through which streetcar lines will pass are not similarly situated to those along the H Street line.

Even if Kingman Park is similarly situated to other communities along the various proposed streetcar lines, the District has proffered a rational basis for treating those communities along the H Street line differently. The Council extensively studied and reviewed the plan for the H Street line before the 2010 Act authorizing the installation of overhead wires was enacted, but had not conducted the same review for the other proposed streetcar lines. On this record, the Plaintiff is not likely to succeed in showing the District's decision to authorize the installation of overhead wires along the H Street line without the procedural requirements imposed on other lines denied the Plaintiff equal protection of the law.

With respect to the car barn, the Plaintiff alleges that Defendant denied the Plaintiff equal protection by "performing excavation work on the grounds of an historic African American site - Spingarn Senior High School, although there are other alternative sites." Pl.'s Am. Mot. at 4; *see*

---

[8] *See* Comm. on Public Works & Transp., Comm. Report (Dec. 3, 2010), available at http://dcclims1.dccouncil.us/images/00001/20101230105542.pdf.

*also* Am. Compl. ¶¶ 52-53.  As Mr. Nicholson explained:

> Spingarn was chosen as the preferred site of the [car barn] based on consideration of several factors, including its proximity to the planned H Street & Benning Road Line, its availability, its status as a District-owned property, and the fact that locating the CBTC on the Spingarn campus is conducive to a planned vocational streetcar training program.  DDOT considered at least eight other sites for the [car barn]—including the site of a former Pepco plant in Northeast, DC—that were ultimately not selected because they either were not owned by the District, would add time or cost to the project, were not large enough for the proposed use, would require site access through residential areas and/or would pose significant challenges or delays in the delivery of the project.

Nicholson Decl. ¶¶ 17-18.  Mr. Nicholson explained that "the Pepco site is not owned by the District," "had not yet been decommissioned at the time DDOT was planning for the CBTC," and "given its distance from the H Street & Benning Road Line, locating the CBTC at the Pepco site would have added time and cost to the project."  Nicholson Decl. ¶ 19.

The Plaintiff does not directly respond to the Defendant's contention that the other sites considered for the car barn were not "similarly situated."  In its Reply, the Plaintiff does assert---without any affidavits or other supporting documentation---that the District's "Trash Transfer Station" is "District-owned real property," "set-back form the community of [sic] at least 500 feet," and "requires no access through a residential community."  Pl.'s Reply at 18.  The "CBTC Site Selection" handout distributed by the Defendant in April 2012 indicates that the trash transfer site is *not* owned by the District, and that constructing the car barn in this location "[w]ould require extending streetcar tracks over Benning Road Bridge and down Anacostia Avenue NE."[9]  The unrebutted evidence submitted by the Defendant indicates Kingman Park is not similarly situated to any of the other communities in which the District considered constructing the car barn, and the Spingarn campus is not similarly situated to any of the other

---

[9]  The handout is available at http://www.dcstreetcar.com/wp-content/uploads/2012/11/aug2012-cbtcselection.pdf.

proposed locations.  To the extent Kingman Park is similarly situated to other communities, the public record of the District's decision offers a rational basis for the District's decision to construct the car barn on the Spingarn campus.  On the present record, the Plaintiff is not likely to succeed in demonstrating the decision to construct the car barn and training facility on the Spingarn campus denied the Plaintiff equal protection.

For the first time in its Reply, the Plaintiff seems to imply that it is also alleging that the decisions to authorize the installation of overhead wires and to construct the car barn on the Spingarn campus were based on the fact the Kingman Park community is predominantly African-American.[10]  *See* Pl.'s Reply at 14-16.  Assuming *arguendo* these claims were properly raised in the Amended Complaint, the Plaintiff is not likely to succeed.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).  As part of this inquiry, the Court considers, among other things, (1) whether the impact of the official action "bears more heavily on one race than another"; (2) "[t]he historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision," including whether the defendant departed from the "normal procedural sequence"; (4) "[s]ubstantive departures" from factors normally considered in reaching a decision; and (5) the administrative history of a decision.  *Id*. at 266-268.

The Plaintiff alleges that two facts demonstrate the 2010 Act authorizing the installation of overhead wires on the H Street line was motivated by a discriminatory purpose: (1) the

_____

[10]  The Plaintiff does not appear to argue that the decisions at issue were motivated by a discriminatory animus towards the socio-economic status of the residents of Kingman Park, but in any event the Plaintiff offers no authority for the proposition that economic status is a protected class for purposes of equal protection.

District limited the installation of overhead wires to the H Street line after various organizations objected to the use of overhead wires; and (2) the Defendant never held community meetings in Kingman Park before passing the 2010 Act.  Pl.'s Reply at 15.  The first assertion is false: the 2010 Act authorized the installation of overhead wires for streetcar lines in all eight wards of the District of Columbia, not just Kingman Park or other predominantly African-American communities.  *See* Nicholson Decl. ¶ 4; DC's Transit Future Sys. Plan Final Report at 4-1.  The Plaintiff does not cite any authority or provide any support for the contention that the District is *required* to conduct such meetings, or departed from an historical practice of conducting community meetings.  Moreover, on June 22, 2010---months before the 2010 Act was passed---the District of Columbia Committee on Public Works and Transportation held a public hearing during which the committee "received testimony from non-profit organizations, ANC commissions, attorneys, local media, business groups, local businesses, transit advocates, local residents, and the Director of the District Department of Transportation."  Comm. on Public Works & Transp., Comm. Report (Dec. 3, 2010) at 2.  Based on the unsubstantiated allegations in the Plaintiff's Reply, the Plaintiff is not likely to succeed on its this claim.

In summary terms, the Plaintiff alleges six factors demonstrate the District's decision to construct the car barn on the Spingarn campus was motivated by the fact Kingman Park is predominantly African-American: (1) the District initially believed Spingarn was not a suitable location for the car barn because of traffic issues, Pl.'s Reply at 15; (2) the District failed to notify Kingman Park that it intended to construct the car barn on the Spingarn campus until after the decision was made; (3) construction of the car barn on the Spingarn campus violates District of Columbia Zoning laws and the Comprehensive Plan; (4) the Preservation Review Board's decision(s) to approve the construction of the car barn was arbitrary and capricious; (5) the

District failed to give "great weight" to the opposition to the Plan by the relevant Advisory

Neighborhood Commission; and (6) "[t]he District made no effort to issue a report and analysis

on the effect of the excavation and construction on the nationally-historic Langston Dwellings

and Langston Golf Course."  Pl.'s Reply at 15-17.  As set forth below, the Plaintiff is not likely

to succeed on its independent claims reflected in the fourth, fifth, and sixth factors.  In any event,

even if each of the six factors prove to be true, fundamentally the Plaintiff's claim is not likely to

succeed because the Plaintiff does not suggest the District elected to construct the car barn in

Kingman Park over an area that is *not* predominantly African-American.  To the contrary, the

only other locations suggested by the Plaintiff, that is, the Pepco Plant and the trash transfer

station, are both in predominantly African-American communities.  The Plaintiff is not likely to

succeed in proving the District's decision to construct the car barn on the campus of Spingarn

High School was motivated by the racial composition of the Kingman Park community.

> 3.     National Historic Preservation Act

Count III of the Amended Complaint alleges the Defendant violated section 106 of the

National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f.  Section 470f provides that

> The head of any Federal agency having direct or indirect jurisdiction over a
> proposed Federal or federally assisted undertaking in any State and the head of
> any Federal department or independent agency having authority to license any
> undertaking shall, prior to the approval of the expenditure of any Federal funds on
> the undertaking or prior to the issuance of any license, as the case may be, take
> into account the effect of the undertaking on any district, site, building, structure,
> or object that is included in or eligible for inclusion in the National Register. The
> head of any such Federal agency shall afford the Advisory Council on Historic
> Preservation established under part B of this subchapter a reasonable opportunity
> to comment with regard to such undertaking.

16 U.S.C. § 470f.  The Plaintiff alleges the Defendant violated this provision by (1) failing to

identify the "Lead Federal Agency" under the NHPA; and (2) "unilaterally determining that the

project would have 'no effect' on the [relevant] historic properties without according the District

of Columbia Preservation Officer (DCHPO) 15 days to comment on the determination."  Am. Compl. ¶ 66.

The NHPA "imposes obligations only on federal agencies, a term expressly defined to exclude Congress and the District of Columbia.  NHPA imposes no obligations on state governments and includes the District of Columbia in its definition of 'state.'"  *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989).  Moreover, the NHPA "imposes obligations only when a project is undertaken either by a federal agency or through the auspices of agency funding or approval."  *Id.*  Accordingly, unless the H Street line or construction on the Spingarn campus is "either federally funded or federally licensed, § 106 simply does not apply to [the] project."  *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 756 (D.C. Cir. 1995).

The Plaintiff does not allege that the installation of overhead wires or construction at the Spingarn site is federally licensed.  Rather, the Plaintiff alleges that "[t]he District streetcar construction project has received federal funding and aid for and during the planning, track and street construction."  Am. Compl. ¶ 87.  In response, the Defendant submitted a declaration from Ronaldo Nicholson, the Chief Engineer for the District of Columbia's Department of Transportation.  Nicholson Decl. ¶ 1.  Mr. Nicholson explains that "[t]he H Street& Benning Road Street Car Project . . . is entirely funded with local dollars, and no federal action or permits are needed for this project."  *Id.* at ¶ 6.  The Plaintiff does not respond to Mr. Nicholson's statement, except to say in its pleading that "the DC streetcar project (the Anacostia line and potentially other areas) receives federal funding."  The Plaintiff's assertion is non-responsive to the representation made by Mr. Nicholson that the *H Street line* has not received federal funding.  Moreover, absent any documentation supporting the Plaintiff's assertion that the project has

received federal funding, Mr. Nicholson's declaration stands unrebutted.  On this record, the Plaintiff is not likely to succeed in showing that the H Street line the Plaintiff seeks to enjoin received federal funding and thus is not likely to succeed on its claim that the Defendant was required to adhere to the provisions of the National Historic Preservation Act.

4.   <u>District of Columbia Comprehensive Plan</u>

Count IV of the Amended Complaint alleges the installation of the overhead wires and construction on the Spingarn campus "violates the District's Comprehensive Plan."  Am. Compl. ¶ 70.  "Pursuant to the Home Rule Act, §§ 203(a), 423(a), the D.C. Council enacted the Comprehensive Plan on April 10, 1984."  *Tenley & Cleveland Park Emergency Comm. v. D.C. Bd. of Zoning Adjustments*, 550 A.2d 331, 336 (D.C. 1988).  "The Comprehensive Plan Act adopted most of the District Elements of the Comprehensive Plan including those for economic development, housing, environmental protection, transportation, public facilities, urban design, preservation and historic features, the downtown area and human services."  *Id.*  "[T]he Comprehensive Plan is a broad framework intended to guide the future land use planning decisions for the District. . . . In short, the Comprehensive Plan is not self-executing."  *Id.* at 337. The District of Columbia Court of Appeals held in *Tenley* that the "Zoning Commission[11] is the exclusive forum for addressing issues of inconsistency under the Comprehensive Plan."  *Id.* at 332.  The Plaintiff acknowledges *Tenley* in its Reply, yet fails to respond to the Defendant's contention that the Comprehensive Plan does not create a cause of action, and that the Plaintiff must seek relief for any purported violations of the Plan before the Zoning Commission.  On the

---

[11]   The Zoning Commission "is an independent, quasi-judicial body. Created by the Zoning Act of 1920, as amended, the ZC is charged with preparing, adopting, and subsequently amending the Zoning Regulations and Zoning Map in a means not inconsistent with the Comprehensive Plan for the National Capital area."  D.C. Office of Zoning, Zoning Comm'n, http://dcoz.dc.gov/services/zoning/commish.shtm (last visited July 25, 2013).

present record, the Court finds the Plaintiff is not likely to succeed in showing that Count IV

states a claim for relief.[12]

### 5.    District of Columbia Zoning Law

The Plaintiff alleges in Count V of the Amended Complaint that the proposed

construction on the Spingarn campus violates District of Columbia zoning laws, D.C. Code § 6-

641.01 *et seq*.  Am. Compl. ¶ 78.  The Defendant argues, and the Plaintiff does not dispute, that

any zoning-based challenge to construction on the Spingarn campus must be brought in the first

instance before the Board of Zoning Adjustment.[13]  D.C. Code § 6-641.07(f).  The District of

Columbia Court of Appeals has exclusive jurisdiction over any appeal from a decision by the

Board of Zoning Adjustment.  *Id*. § 2-510(a).  Even if this Court has jurisdiction over the

Plaintiff's claim that the construction on the Spingarn campus violates D.C. zoning laws, the

United States Court of Appeals for the District of Columbia Circuit discourages courts in this

District from exercising supplemental jurisdiction over claims challenging administrative

decisions by the District of Columbia.  *See Lightfoot v. District of Columbia*, 448 F.3d 392, 399

(D.C. Cir. 2006).  Based on the present record, the Plaintiff is not likely to succeed in obtaining

relief in this Court on his claim that the construction on the Spingarn campus violates District of

---

[12]    Because the Plaintiff does not address the Defendant's arguments regarding the Comprehensive Plan at all, the Court need not decide whether exhaustion before the Zoning Commission is a pre-requisite to filing suit in this court, or whether federal courts lack jurisdiction to consider claims arising out of the Comprehensive Plan generally.  *See Tenley*, 550 A.2d at 332 ("[B] because the Zoning Commission is the exclusive forum for addressing issues of inconsistency under the Comprehensive Plan, [plaintiff] failed to exhaust its administrative remedy by not presenting its case to the Zoning Commission.").

[13]    The Board of Zoning Adjustment "is an independent, quasi-judicial body. It is empowered to grant relief from the strict application of the Zoning Regulations (variances), approve certain uses of land (special exceptions), and hear appeals of actions taken by the Zoning Administrator at [the Department of Consumer and Regulatory Affairs]."  D.C. Office of Zoning, Bd. of Zoning Adj., http://dcoz.dc.gov/services/bza/bza.shtm (last visited July 25, 2013). A rotating member of the Zoning Commission serves on the Board.  *Id.*

Columbia Zoning laws.

6.      District of Columbia Environmental Policy Act of 1989

Count VI of the Amended Complaint alleges the Defendant violated section 4 of the District of Columbia Environmental Policy Act of 1989, D.C. Code § 8-109-.01 *et seq.*, by failing to conduct an environmental impact study regarding the anticipated construction on the Spingarn campus.  Am. Compl. ¶ 84.  The Environmental Policy Act provides that

> Whenever the Mayor or a board, commission, authority, or person proposes or approves a major action that is likely to have substantial negative impact on the environment, if implemented, the Mayor, board, commission, authority, or person shall prepare or cause to be prepared, and transmit, in accordance with subsection (b) of this section, a detailed EIS at least 60 days prior to implementation of the proposed major action, unless the Mayor determines that the proposed major action has been or is subject to the functional equivalent of an EIS.

D.C. Code § 8-109.03(a).  The Plaintiff argues the Defendant violated this provision because (1) "the District Government has admitted that the proposal would have a major adverse impact on the community," but "to [Plaintiff's] knowledge, an EIS has not been prepared or issued."  Am. Compl. ¶¶ 84.

Pursuant to District regulations, the DDOT submitted an Environmental Impact Screening Form for the H Street/Benning Road line project to the District Department of Consumer and Regulatory Affairs.  Nicholson Decl. ¶ 25; *see* D.C. Mun. Regs. tit. 20, § 7201 *et seq.*  DDOT submitted the results of several studies and investigations evaluating the potential environmental impact of the construction on the Spingarn campus.  Nicholson Decl. ¶¶ 24-25. For example, Triad Engineering, Inc., conducted an "Environmental Indicator Site Assessment," on the site and concluded that "no significant indicators of environmental concern were identified during the subsurface soil assessment and the DDOE required no further investigation of subsurface conditions at the Site based on the results of the assessment."  Bradley C. Pearson,

Envtl. Indicator Site Assessment, Benning Road CBTC (Feb. 3, 2012) (the "Triad Assessment"), at 3.[14]   Based on DDOT's submission, the Department of Consumer and Regulatory Affairs determined "that the proposed action is not likely to have substantial negative impact on the environment, and submission of an Environmental Impact Statement (EIS) is not required." Def.'s Ex. B (2/27/13 Ltr.).  The Defendant contends that the Plaintiff is not likely to succeed on its claim that the Defendant violated D.C. Code § 8-109.03(a) because "Plaintiff has not identified any basis upon which the Court could determine DCRA's finding to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."  Def.'s Opp'n at 26.

The Plaintiff responds by simply asking a series of questions, and asserting that "[t]his is a major project that requires an EIS."  Pl.'s Reply at 12.  In its motion, the Plaintiff notes that DDOT initially "did not evaluate" Spingarn High School as a location for the car barn "due to *traffic* and *community* impact," noting "[t]his alternative would involve the streetcar tracks crossing the westbound travel lanes from the median into the yard adjacent to Spingarn High School."  Pl.'s Am. Mot. at 24 (citing Compl., Ex. 3 at 11) (emphasis added).  However, the statute only requires an EIS if the project is likely to have substantial negative impact on the *environment*.  The Plaintiff's motion lists three bullet points of purported "[d]amage created by the [e]xcavation work on the Spingarn [s]ite," but does not cite to any evidence in support of these allegations.  Absent *any* evidence from the Plaintiff demonstrating that the Department of Consumer and Regulatory Affairs' conclusion that construction of the car barn and substation is not likely to have a substantial negative impact on the environment is an arbitrary or capricious decision, the Court finds the Plaintiff is not likely to succeed on this claim.

---

[14]   Available at http://www.dcstreetcar.com/wp-content/uploads/2013/05/Environmental-Site-Assessment-Report.pdf.

7.      Federal-Aid Highway Program

The Plaintiff alleges in Count VII of the Amended Complaint that the Defendant violated certain provisions of the Federal-Aid Highways Program.  Am. Compl. ¶ 87.  However, the statutory provisions cited by the Plaintiff place certain obligations on the Secretary of Transportation, not state or local governments.  *See* 49 U.S.C. § 303(c) ("[T]he Secretary may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance . . ."); 28 U.S.C. § 138 ("[T]he Secretary shall not approve any program or project . . . which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials . . .").  The Plaintiff fails to articulate why the Secretary has any obligations with respect to the streetcar project, particularly in light of the unrebutted declaration from Mr. Nicholson indicating the H Street line is not federally funded.  Thus, the Plaintiff is not likely to succeed on its claim that the Defendant violated the Federal-Aid Highway Program.

8.      D.C. Historic Landmark & Historic District Protection Act of 1978

In Count VIII of the Amended Complaint, the Plaintiff contends, without elaboration, that "[t]he D.C. Preservation Review Board's decision to permit the streetcar construction on the grounds of Spingarn was arbitrary, capricious, and an abuse of discretion, and in violation of the D.C. Historic Landmark and Historic District Protection Act of 1978 (D.C. Law 2-144), D.C. Code Title 6, Chapter 11."  Am. Compl. ¶ 92.  The Defendant argues that the historic landmark act does not create a private right of action through which the Plaintiff could challenge the

27

Preservation Review Board's decision. Def.'s Opp'n at 28-29. The Plaintiff does not dispute that even assuming the Plaintiff can challenge the Board's decision, the Plaintiff must seek review before the Mayor's agent, and then petition the District of Columbia Court of Appeals. *See Embassy Real Estate Holdings, LLC v. D.C. Mayor's Agent for Historic Preservation*, 944 A.2d 1036, 1044 (D.C. 2008); D.C. Code § 2-510. Moreover, as with the Plaintiff's zoning law claim, the D.C. Circuit discourages federal courts in this District from exercising supplemental jurisdiction over this type of claim, assuming the Plaintiff demonstrates it can bring the claim at all. *Lightfoot*, 448 F.3d at 399.

Furthermore, the Plaintiff has not identified which decisions by the Preservation Review Board regarding construction on the Spingarn were in error. Nor does the Plaintiff articulate any basis on which the Court could conclude that the Preservation Review Board's decision was arbitrary or capricious. The Plaintiff cites portions of statements made by one Board member during the May 2, 2013, hearing indicating he wished the Board had set aside a day "6 or 8 months ago . . . [to] just get into the details a lot more." Pl.'s Am. Mot. at 5 (quoting Compl., Ex. 9 (Stmt. of Graham Davidson)). Nevertheless, Mr. Davidson voted *in favor* of authorizing the revisions to the plan for construction on the Spingarn campus discussed during the May 2, 2013 Board meeting. HPRB Actions, Apr. 25 & May 2, 2013, at 4 (noting the Board voted 5-0 to approve the "refinements to approved concept for proposed streetcar car barn").[15] On the present record, the Plaintiff is not likely to succeed on its claim challenging the Preservation Review Board's decision permitting construction on the Spingarn campus.

---

[15] The HPRB Actions report for the April 25 and May 2, 2013 meetings is available at http://dc.gov/DC/Planning/Historic+Preservation/About+HPO+&+HPRB/Who+We+Are/Historic+Preservation+Review+Board/Monthly+Public+Notice/HPRB+April+2013/HPRB+Actions,+April+25+and+May+2,+2013.

9.      Advisory Neighborhood Commission Input

The allegations in Count IX of the Amended Complaint are less than clear, but the thrust of the claim appears to be that the Defendant did not accord "great weight" to the 5B Advisory Neighborhood Commission's opposition to the construction of the car barn on the grounds of Spingarn High School.  *See* Am. Compl. at 25.  "Advisory Neighborhood Commissions" may advise the District of Columbia "with respect to all proposed matters of District government policy including, but not limited to, decisions regarding planning, streets, recreation, social services programs, education, health, safety, budget, and sanitation which affect that Commission area."  D.C. Code § 1-309.10(a).  Each Commission notified of a proposed District action under section 1-309(b) or (c) "shall consider each such action or actions in a meeting with notice given in accordance with § 1-309.11(c) which is open to the public in accordance with §1-309.11(g).  The recommendations of the Commission, if any, shall be in writing and articulate the basis for its decision."  *Id.* § 1-309.10(d)(1).  "The issues and concerns raised in the recommendations of the Commission shall be given great weight during the deliberations by the government entity.  Great weight requires acknowledgement of the Commission as the source of the recommendations and explicit reference to each of the Commission's issues and concerns."  *Id.* § 1-309.10(d)(3)(A).

The Amended Complaint alleges the 5B Advisory Neighborhood Commission "voted to oppose the District's proposed streetcar barn construction on the grounds of Spingarn High School.  The 5B ANC Commission's official opposition was purportedly issued by letter dated October 31, 2012."  Am. Compl. ¶ 95 (citing "Exhibit # 5").  The Plaintiff did not attach any exhibits to the Amended Complaint, so the Court assumes the reference in paragraph 95 is to Exhibit 5 of the original Complaint.  However, Exhibit 5 to the original Complaint is a letter

dated October 31, 2012, and addressed to the D.C. Preservation Office and Review Board in support of the Plaintiff's "Application for Historic Designation of Spingarn High School." Compl., Ex. 5 at 1. The letter asserts that

> Neither the District Department of Transportation nor the Office of Planning sought the advice and consent of Advisory Neighborhood Commission 58 regarding the plan to build a streetcar maintenance facility on the front lawn of Spingarn Senior High School. The Commission was not given "great weight" in consideration of this matter as required by District of Columbia law.

*Id.* at 2. The October 31, 2012, letter does not purport to set forth the 5B Advisory Neighborhood Commission's recommendations regarding construction on the Spingarn campus, nor does the letter indicate that the Commission ever issued a written recommendation as required by D.C. Code § 1-309.10(d)(3)(A). Bernice Blacknell, the Advisory Neighborhood Commissioner for 5B04, indicated in her affidavit attached to the Plaintiff's original complaint and initial motion that "[t]he 5B ANC Commission [sic] also issued a resolution which opposed the construction of a car barn on the grounds of Spingarn High School," but did not provide a copy of the resolution, or provide any additional details. Compl., Ex. 4 (Blacknell Decl.) ¶ 9.

The Defendant submitted a declaration from Aaron Rhones, a Program Manager with DDOT who serves as the point of contact for advisory neighborhood commissions. Def.'s Ex. C (Rhones Decl.). Mr. Rhones indicates that DDOT "does not have a record of ever having received a resolution from ANC 5B opposing construction of the CBTC on the Spingarn campus," and "based on conversations with relevant DDOT personnel, no one on the DC Streetcar team has ever received or recalls seeing any such ANC resolution." *Id.* at ¶¶ 5-6. The Plaintiff responds by asserting that "the 5B ANC Commission opposed the excavation and construction of a maintenance facility on the Spingarn campus." Pl.'s Reply at 17 (citing the "5B ANC Commission Resolution, attached to KPCA's motion"). The Plaintiff did not submit

*any* exhibits in support of its Amended Motion.  The only exhibits attached to the Plaintiff's original motion were the affidavit of Bernice Blacknell regarding her role as the 5B04 Advisory Neighborhood Commissioner, and the affidavit of Veronica Raglin regarding the injuries to the Kingman Park community she alleges would result from the construction on the Spingarn campus.  Neither affidavit attaches a copy of the 5B ANC resolution referenced in the Amended Complaint.  Having failed to produce the resolution that forms the basis for its claim in order to rebut the declaration submitted by the Defendant, the Plaintiff is not likely to succeed in proving that the Defendant failed to give "great weight" to the recommendation of the 5B Advisory Neighborhood Commission.

### 10.   D.C. Human Rights Act

The Plaintiff's final claim, Count X, contends that the Defendant violated unspecified provisions of the District of Columbia's Human Rights Act.  The Plaintiff alleges the Defendant intentionally discriminated against African-Americans by constructing the car barn and electrical substation in a predominantly African-American community, disregarding "the historic character of Spingarn High School."  Am. Compl. ¶¶ 97, 99-101.  The Plaintiff further contends that the streetcar project will have a discriminatory effect on African-Americans.  *Id.* at ¶¶ 101-105.  The Defendant makes a number of arguments in response to this claim, but the Plaintiff failed to respond to any of the Defendant's arguments.  The Plaintiff does not dispute the Defendant's suggestion that construction on the Spingarn campus does not violate the Act because, assuming the construction alters the view of the campus or surrounding historical sites, "all District residents w[ill] be denied the benefit of an unaltered, unobstructed view of the historic site."  Def.'s Reply at 33.  Nor does the Plaintiff dispute that it cannot sustain a "discriminatory effect" claim because the Defendant has demonstrated that the selection of Spingarn High School as the

site for the car barn and electrical substation is "independently justified for some nondiscriminatory reason." *Id.* at 32 (quoting *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc)).  Accordingly, on this record, the Court finds the Plaintiff is not likely to succeed in showing the Defendant violated the District of Columbia Human Rights Act.

   C.   *Irreparable Injury*

   To establish irreparable harm, a plaintiff must show that its injury is "great, actual, and imminent." *Hi–Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).  The Plaintiff must also "demonstrate irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).  With respect to the overhead wires, the Plaintiff argues it will face irreparable injury due to obstructed views and the electromagnetic fields ("EMFs") emitted from the wires.  First, the Plaintiff offers no explanation as to why the obstruction of views on H Street and Benning Road is an *irreparable* injury; it could be remedied by simply taking down the wires.  Second, the Plaintiff cites to a report by A.M. Muc, Ph.D., to support its contention that EMFs emitted by the overhead wires will cause irreparable injury.  Pl.'s Reply, Ex. 4 (A.M. Muc, Electromagnetic Fields Associated with Transp. Sys.).  As a threshold matter, the Court notes there is no evidence to suggest the overhead wires will emit electromagnetic radiation until passenger service on the line begins in 2014, meaning this harm is not imminent.  Furthermore, the Plaintiff does not demonstrate that the modes of transportation analyzed in Dr. Muc's report are in any way analogous to the system to be installed on the H Street line.  Ultimately, Dr. Muc concluded that "the possibility of significant detrimental effects from the low frequency EMFs associated with transportation systems can only be considered to be rather speculative and remote at the present time." *Id.* at 2;

32

*see also id.* ("The overall results of research related to concerns about possible detrimental effects of EMFs, particularly in the context of present knowledge about transportation system EMFs, is reassuring rather than alarming.").

Turning to the construction on the Spingarn campus, admittedly the construction of a substation and car barn on the site by definition will alter the views of the campus, though the Plaintiff makes no attempt to demonstrate how significant the obstruction may be.  Nor does the Plaintiff establish that this injury is irreparable.  It does not appear that the District intends to take down or alter any of the historic buildings on the Spingarn campus.[16]  Any injury caused by obstructing the view of the Spingarn campus could in theory be remedied by taking down the car barn or other structures erected by the District.

To establish potential environmental damage from excavation on the Spingarn campus, the Plaintiff relies entirely on a report from 1993 evaluating the potential environmental impacts of the expansion of the Robert F. Kennedy Stadium, located over 2,500 feet from the Spingarn campus.  Pl.'s Reply, Ex. 4 (Final Envtl. Impact Stmt. (Oct. 1993)).  The limited portions of the report provided by the Plaintiff indicate that in light of the concentration of lead detected in the soil, some portion of the soil from the stadium site "would have to be handled as a hazardous waste upon excavation."  *Id.* at 3-122.  The Plaintiff argues that "[t]he stadium grounds are a very short distance from Spingarn, and therefore, it is safe to assume that contaminated soil is also located on the grounds of Spingarn."  Pl.'s Reply at 12.  There simply is no basis in the record for this assumption.  Moreover, the publicly available soil assessments *of the Spingarn*

---

[16]    The Triad Assessment indicates the District intends to demolish a "vacant library kiosk structure in the southeastern corner of the [s]ite," but there is no indication the District otherwise plans to remove or alter the buildings presently located on the Spingarn campus.  *See* Triad Assessment at 3-4.

*site* contradict this assumption.  *See* Triad Assessment at 3 ("Based on a review of the laboratory results and the soil boring work plan . . . DDOE/WQD has no objections to standard disposal . . . and had no recommendation for further investigation or analysis of subsurface conditions at the Site.").   Even if the Court were to assume the soil on the Spingarn campus has the same concentrations of lead as detected at RFK stadium twenty years ago, nothing in the report submitted by the Plaintiff suggests *any* environmental harm would result from excavating the Spingarn site.   There is no evidence in the record to suggest excavation or construction on the Spingarn campus will result in the release of *any* "hazardous materials" as the Plaintiff suggests.

Finally, the Plaintiff argues that construction on the Spingarn campus may damage the foundations of homes in the area.   In support of this argument, the Plaintiff relies entirely on vague declarations from its members that construction associated with the installation of the tracks on H Street and Benning Road damaged the foundations of their homes.   *See*, *e.g.*, Johnson Decl. ¶ 3.   However, none of the declarants allege, articulate how construction *at a different location* is likely to harm their property.   Nor is there any suggestion that any damage could not be remedied through money damages.

In sum, the only potentially irreparable damage credibly identified by the Plaintiff is the obstruction of the view of Spingarn High School by the car barn and other facilities.   The Court does not question the value of Spingarn High School to the community, but the Plaintiff is not likely to succeed on any of its claims challenging the construction on the Spingarn campus. Therefore, although the risk of irreparable injury in isolation may slightly favor granting the injunction as to construction on the Spingarn campus, the risk of injury is substantially outweighed by the fact the Plaintiff is not likely to succeed on any claim that might remedy that alleged injury.

D.      *Balance of the Equities and Public Interest*

Finally, a plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in its favor, and that an injunction would be in the public interest. *Winter*, 555 U.S. at 20.  The Defendant argues that if construction on the H Street line is delayed, the District will incur approximately $16,500 in daily overhead costs *per day*.  Nicholson Decl. ¶ 26.  If DDOT is unable to complete the initial phase of construction by October 2013---that is, the tracks and temporary facilities for testing and certification---the District will incur "significant costs to store at an offsite facility the streetcar passenger vehicles that are scheduled to be delivered to the Spingarn location," including "a cost of approximately $150,000 simply to transport the five streetcar vehicles to an appropriate storage facility."  *Id.* at ¶ 28.  Moreover, if construction of the car barn is enjoined, the District will incur costs for storage of construction materials, including contact wires and substations.  *Id.* at ¶ 27.  "Without knowing the length of the injunction . . . the specific costs of storing these materials cannot be precisely defined at this time.   DDOT estimates, however, that these costs would likely approach $100,000 if the delay extends to 6-months."  *Id.*  Additional costs would be incurred in the form of lost revenue if an injunction delays the start of passenger service on the H Street line.  *Id.* at ¶ 29.  In total, the District estimates that "if it were enjoined for period of 180 calendar days . . . from constructing overhead wires along the H Street & Benning Road Line and moving forward with the planned construction on the Spingarn campus, it would incur costs and damages in the amount of $4,272,890.65."  *Id.* at ¶ 30.

The Plaintiff argues the financial cost to the District is outweighed by the potential injury to the Kingman Park community, and the community's interest in not being subject to disparate treatment.  As set forth above, the Plaintiff is not likely to succeed on the merits of its equal

protection claim, and the potential irreparable injury to the community is extremely limited at best. By contrast, the financial costs the District of Columbia would incur by even a limited delay in construction are significant. Normally the financial risk to the party subject to an injunction could be offset by requiring the party seeking the injunction to post a bond. Here, the Plaintiff is asking the Court to waive any bond requirement, and in any event it is not clear that the Plaintiff—an unincorporated neighborhood civic association---could post a secured bond sufficient to pay the costs and damages the District may incur while an injunction is in place. Thus, the financial cost of an injunction in this case would be borne by the tax-payers of the District of Columbia residents, including the residents of the Kingman Park community. Furthermore, delaying construction of the H Street line would deprive the Kingman Park residents, and residents of surrounding communities, of access to public transportation that is otherwise limited along H Street and Benning Road. On this record, particularly in light of the fact the Plaintiff is not likely to succeed on any of its claims, the financial costs the District of Columbia and its residents would incur as a result of any injunction significantly outweigh the irreparable injury articulated by the Plaintiff.

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff is not likely to succeed on the merits of its claims, which standing alone may justify denying the Plaintiff's request for temporary injunctive relief. Moreover, the only "irreparable" injury the Plaintiff is likely to suffer is some obstruction of the view of Spingarn High School. By contrast, the District of Columbia would be forced to expend hundreds of thousands of tax dollars if installation of the overhead wires on the H Street line and construction on the Spingarn campus is delayed for even just a few months. On balance, the Court finds the relevant factors weigh heavily against enjoining the installation of overhead

36

wires along the H Street line and construction of a car ban and substation on the campus of Spingarn High School.   Accordingly, the Plaintiff's [5] Amended Motion for Temporary Restraining Order, for Preliminary Injunction and for Waiver of Bond is DENIED.   An appropriate Order accompanies this Memorandum Opinion.


_____ */s/* _____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE